## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ERIC P. PSONAK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-959-SLR-SRF |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### REPORT AND RECOMMENDATION

Plaintiff Eric P. Psonak ("Psonak" or "plaintiff") appeals from a decision of Carolyn W. Colvin, the Commissioner of the Social Security Administration ("Commissioner" or "defendant"),[1] denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act. The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).

Presently before the court are cross-motions for summary judgment filed by Psonak and the Commissioner. (D.I. 14, 17) Psonak asks the court to order an award of benefits, or, in the alternative, to remand this case for further administrative proceedings. (D.I. 14, 15) The Commissioner requests that the decision of the administrative law judge ("ALJ") be affirmed. (D.I. 17, 18) For the reasons set forth below, I recommend that the court deny Psonak's motion and grant the Commissioner's motion.

---

[1] Carolyn W. Colvin became the Commissioner of Social Security on February 13, 2013, after this proceeding was initially filed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin replaced the previous Commissioner, Michael J. Astrue, as the defendant in this case.

## I.  BACKGROUND

### A.  Procedural History

Psonak protectively applied for SSI on February 23, 2007, alleging disability beginning on September 15, 2006 due to a tumor in his neck and fibromyalgia in his right arm and neck. (D.I. 9, Tr. at 139, 163) Psonak's claim was denied initially on March 12, 2007, and upon reconsideration on November 1, 2007. (*Id.* at 85-86) Psonak requested a hearing before an ALJ, which took place on January 8, 2009. (*Id.* at 34, 97)

On April 29, 2009, the ALJ issued a decision confirming the denial of benefits. (*Id.* at 15-33) Psonak requested a review of the ALJ's decision by the Appeals Council on May 12, 2009, but the request for review was denied and, therefore, the ALJ's decision became the final decision of the Commissioner subject to judicial review. (*Id.* at 4-7, 10-11) On November 10, 2010, Psonak filed the current action for review of the final decision. (D.I. 1)

### B.  Factual Background

#### 1.  Medical History

Psonak began treating with Dr. James W. Sheehan on October 12, 2006 for pain, numbness, stiffness, and weakness in his head, neck, and spine. (D.I. 9, Tr. at 376-77) Dr. Sheehan described moderate limitation in Psonak's cervical range of motion and mild limitation in his lumbar range of motion, and cervical X-rays showed evidence of degeneration and cervical postural abnormality. (*Id.* at 378-81) Dr. Sheehan recommended treatment with supervised electric stimulation spasm, mechanical traction, manipulation, manual therapy, and ultrasound. (*Id.* at 382-83) Psonak returned to Dr. Sheehan on November 8, 2006, noting improvement in his neck and back pain and resolution of his muscle weakness and stiffness. (*Id.* at 384) During this exam, Psonak exhibited only mild limitation in his cervical and lumbar range of motion. (*Id.*

at 387-89) Dr. Sheehan concluded that further treatment of the cervical and lumbar conditions, as well as lesions of the nerve roots, was not required because it was well-controlled. (*Id.* at 390)

On November 23, 2006, Psonak was admitted to the inpatient psychiatric ward at Wilmington Hospital with suicidal ideation following a drunk driving accident. (*Id.* at 244) He was diagnosed with substance-induced mood disorder, depression, chronic and musculoskeletal radicular pain, chronic low back pain, and hepatitis C. (*Id.* at 245) He was prescribed Zoloft and Trazodone, and was stabilized with supportive medical and psychiatric interventions. (*Id.* at 245-46) He was discharged on November 27, 2006.[2] (*Id.* at 246)

On November 26, 2006, Psonak visited Daniel J. Elliott, M.D., for chronic lower back pain and right upper extremity pain. (*Id.* at 251) Dr. Elliott observed that Psonak had multiple tumors on his forearms, upper arms, and legs. (*Id.* at 252) Dr. Elliott diagnosed Psonak with radicular right arm pain and weakness, chronic lower lumbar spine pain, hepatitis C, anemia, thrombocytopenia, lipomas or neurofibromas, calvarial lesion, alcohol and psychiatric issues, and hyperglycemia. (*Id.* at 253) Psonak underwent an MRI of his cervical and lumbar spine, which revealed lumbar and cervical radiculopathy. (*Id.* at 278-81)

Psonak returned to Dr. Sheehan on November 30, 2006, having experienced a worsening of his previous conditions due to the November 23, 2006 automobile accident. (*Id.* at 393) During a subsequent visit with Dr. Sheehan on December 20, 2006, Psonak reported that the treatment had improved his condition, and tests revealed only mild limitation in his cervical and lumbar range of motion, with a complete range of motion in his biceps, wrist, and triceps. (*Id.* at 395, 401-02) Dr. Sheehan recommended manipulation, therapeutic exercises, and supervised electric stimulation to treat Psonak's conditions. (*Id.* at 404-05)

---

[2] The parties do not dispute the ALJ's assessment of limitations stemming from Psonak's

On January 9, 2007, Psonak began treating with neurologist Enrica Arnaudo, M.D. for severe progressive right hand weakness and numbness. (*Id.* at 885-89) Dr. Arnaudo noted severe right hand and forearm atrophy with numbness, and referred Psonak for an EMG/nerve conduction study of the right upper extremity. (*Id.* at 888) Dr. Arnaudo observed that Psonak had symptoms consistent with entrapment neuropathies and recommended that he receive a neurosurgical consultation for cervical root or nerve decompression. (*Id.* at 889) Psonak subsequently underwent an MRI of his right brachial plexus and cervical spine, which showed abnormal soft tissue on the right side of his thoracic spine, mild cervical degenerative disc disease, and multilevel cervical spondylosis with secondary foraminal stenosis. (*Id.* at 890-92)

On February 5, 2007, Psonak visited neurosurgeon Kennedy Yalamanchili, M.D., who conducted imaging studies and located a right-sided mass on his spine. (*Id.* at 767) He concluded that Psonak suffered from multilevel cervical disk disease and significant nerve impingement, although there was no evidence of spinal cord compression. (*Id.* at 769) Psonak underwent a biopsy of the soft tissue mass on his spine on February 9, 2007. (*Id.* at 567) Imaging studies from February 21, 2007 showed foraminal tumors on his thoracic spine. (*Id.* at 758) Dr. Yalamanchili diagnosed Psonak with neurofibromatosis and recommended surgical removal of two subcutaneous lesions in the thoracic region. (*Id.*)

On March 22, 2007, Dr. Yalamanchili performed a laminectomy with foraminotomy, an instrumented fusion, and removal of a spinal mass. (*Id.* at 462-504) Psonak returned to the hospital on March 29, 2007 with post-operative neck and chest pain and received Dilaudid. (*Id.* at 620) Psonak subsequently developed a thoracic wound infection and was admitted to the hospital from April 4, 2007 to April 10, 2007. (*Id.* at 505-12) Surgery was performed to achieve

---

substance abuse and mental conditions.

decompression of an abscess. (*Id.* at 525-26) Psonak followed up with Wesley W. Emmons, III, M.D. for his wound infection on several occasions between May and August 2007. (*Id.* at 574-77)

On May 2, 2007, Dr. Yalamanchili noted that Psonak's incision was healing well, the swelling was decreased, there was no discharge or tenderness at the incision site, and although he had decreased strength in his right upper extremity, the range of motion in his neck had improved and he had full range of motion in both shoulders. (*Id.* at 755)  X-rays of his thoracic spine showed appropriate bone growth and proper instrumentation placement with staple spinal alignment. (*Id.*)  Dr. Yalamanchili gave Psonak permission to increase his activity level in moderation and recommended physical therapy. (*Id.*)  Dr. Yalamanchili specifically noted that Psonak could return to work in a light duty supervisory capacity for the next six to eight weeks. (*Id.*)

Psonak began visiting Adrienne N. Pinckney, MPT for physical therapy on May 10, 2007. (*Id.* at 692)  Psonak presented with decreased myotomal strength in certain vertebrae, decreased cervical thoracic range of motion, and residual neural tension in his right upper extremity. (*Id.*)  By June 6, 2007, Psonak presented asymptomatic in his neck and upper back. (*Id.* at 691)

On May 14, 2007, Psonak visited Dr. Arnaudo, who noted severe impressive diffuse mass lesions with lipomas and neurofibromas throughout the arms, forearms, and thighs. (*Id.* at 883)  Psonak underwent surgery with Dr. Yalamanchili on November 26, 2007 to remove neurofibromas on his right upper extremity. (*Id.* at 784)  On December 19, 2007, Psonak underwent an MRI that revealed degenerative disc disease ranging from mild to severe throughout the cervical spine. (*Id.* at 720)  The MRI showed evidence of postoperative scar

tissue, but no solid mass or abscess. (*Id.* at 740) Dr. Yalamanchili performed surgery on January 14, 2008 to remove neurofibromas on Psonak's left upper extremity. (*Id.* at 740)

Psonak began treating with orthopedist Evan H. Crain, M.D. on March 5, 2008 for pain in his left upper extremity. (*Id.* at 733) Dr. Crain reported that Psonak had full painless range of motion in the neck, good shoulder range of motion, both active and passive, and his X-rays were normal, revealing no spur formation, joint space narrowing, or degenerative joint disease. (*Id.*) At Dr. Crain's suggestion, an EMG was performed on March 20, 2008, revealing mild, chronic left median entrapment neuropathy at the wrist consistent with mild to moderate carpal tunnel syndrome. (*Id.* at 775) On March 31, 2008, Psonak noted improvement in his left shoulder since beginning treatment with Dr. Crain, although the right side had not improved. (*Id.* at 732)

On June 16, 2008, after reviewing the results of Psonak's recent cervical MRI and thoracic spine X-rays, Dr. Yalamanchili concluded that no further surgeries were necessary to treat Psonak's spine and referred Psonak to a pain specialist. (*Id.* at 739) On July 2, 2008, Psonak visited James E. Downing, M.D., a spine pain consultant, for neck and upper back pain. (*Id.* at 796) Dr. Downing discussed a trial of lower cervical facet injections and physical therapy, but Psonak indicated that he did not have time to participate in physical therapy. (*Id.* at 797) From September 17, 2008 to October 13, 2008, Psonak visited Julia Kegelman, D.P.T. of The Back Clinic, Inc. (*Id.* at 798) Psonak made good progress with treatment and felt that he had more endurance for daily activities and reduced pain levels, but he was severely disabled according to the Oswestry Disability Index. (*Id.*)

On October 30, 2008, E. Russell Ford, M.D., Psonak's family physician, completed a physical capacities evaluation of Psonak, opining that Psonak could sit for two to three hours without changing position if given a soft chair and a pillow, and he could stand and walk for

6

fifteen to twenty minutes at a time. (*Id.* at 806) Dr. Ford observed severe pain in Psonak's right upper extremity, hips, neck, upper and lower back, and legs, which was worsened by prolonged sitting standing, walking, and wet or cold weather. (*Id.*) Dr. Ford noted that Psonak had numbness, tingling, and weakness in his right upper extremity. (*Id.*) Dr. Ford opined that Psonak could lift and carry up to ten pounds occasionally, but could not push, pull, grasp, or perform fine manipulation with his right upper extremity. (*Id.* at 807-08) According to Dr. Ford, Psonak could bend, squat, climb, reach above, stoop, and kneel only occasionally, and doing so would be very painful. (*Id.* at 808) Moreover, he concluded that Psonak would need unscheduled interruptions of his work routine and would miss work frequently. (*Id.* at 810) Dr. Ford opined that Psonak would not be able to work due to his chronic severe pain, stiffness, weakness, muscle spasms, numbness, burning and tingling. (*Id.* at 811) Dr. Arnaudo completed an identical physical capacities evaluation on October 27, 2008. (*Id.* at 870-75)

On November 14, 2008, Dr. Arnaudo diagnosed Psonak with neurofibromatosis, severe right hand weakness and numbness, and recent right foot drop. (*Id.* at 877) Dr. Arnaudo indicated that the results of Psonak's November 19, 2008 EMG revealed subacute left peroneal entrapment neuropathy at the fibular head, which was consistent with his symptoms, clinical examination, and his recent improvement with physical therapy. (*Id.* at 903-04)

### 2. The Administrative Hearing

#### a. Plaintiff's testimony

Psonak was forty-six years old at the time of the hearing before the ALJ. (D.I. 9, Tr. at 38) He testified that he was married, but his wife died in 2005, and he now lives with his two minor children in a first floor apartment. (*Id.* at 38-39) Psonak obtained his GED and attended community college for a short period of time, but he did not graduate. (*Id.* at 39) He is able to

read with glasses but has some issues with his vision due to his diabetes. (*Id.*) He cannot write legibly on a consistent basis because he cannot use his right dominant hand. (*Id.* at 40) He is able to perform basic math but does not handle his finances without his son's assistance. (*Id.*)

Psonak testified that, in the last fifteen years, he has worked in underground communications installing pipe and wire for telephones, television and electric. (*Id.* at 42) He would run equipment, dig, drive equipment, load and unload tractors, and fill out paperwork and reports. (*Id.*) He injured his back for the first time in the early 1980's and could not maintain a supervisory position as a result of his injury. (*Id.* at 43) He tried to go back to work full time after his wife died, but he worked for less than two months when his right arm began to bother him, and he left in September of 2006. (*Id.* at 44-45)

Psonak testified that his doctors diagnosed him with neurofibromatosis, carpal tunnel syndrome, and tumors near his spine. (*Id.* at 47) He was able to obtain Medicaid, and he received an operation to remove the tumors. (*Id.* at 48) Following the operation, the surgical incision became infected. (*Id.*) Psonak claims that after the operation, the nerves in his right hand never came back, and he is not able to use his right arm or hand very much. (*Id.*) He cannot lift, carry, or grab with his dominant right hand. (*Id.* at 49)

Psonak testified that two of the fingers on his left hand went numb in March 2008 and he had X-rays, an MRI, and an EMG performed on his left arm. (*Id.* at 50) Dr. Arnaudo diagnosed him with left chronic carpal tunnel syndrome. (*Id.*) Psonak has difficulty using his left arm and hand because it is not his dominant arm, and it takes him much longer to complete tasks with it. (*Id.* at 51) He testified that he also has tumors in his left arm, as well as shoulder pain caused by bone spurs. (*Id.*)

Psonak testified that, at the time of the hearing, he had tumors in his right and left arms,

8

his stomach, his ribcage, his back, his legs, and his head. (*Id.* at 51-52) Many of them grew back after he underwent surgery, and new ones have grown since his surgery. (*Id.* at 52) He estimated that he had approximately twenty or thirty tumors removed during surgery. (*Id.*)

Psonak was also diagnosed with foot drop and had an EMG performed on his left leg. (*Id.* at 54) According to Psonak, the top of his foot is numb and his toes sometimes go numb. (*Id.* at 54-55) He experiences numbness in the front part of his shin and his gait is uneven. (*Id.* at 55) He testified that he experiences pain in his left hip when he walks, and the pain runs down his leg. (*Id.*)

Psonak testified that he can walk for a couple of blocks, or for about fifteen to twenty minutes, before his hip and back begin to hurt. (*Id.*) He indicated that he can stand for a maximum of fifteen to twenty minutes before he needs to sit down for a period of time. (*Id.* at 57) He is able to sit in a reclining chair for a couple of hours at a time, but can only sit in a regular chair for about a half hour and needs to change positions every fifteen to twenty minutes. (*Id.* at 57-58) He is not able to lift or carry anything with his right hand unless it is the weight of a piece of paper which he can pin against his chest with his arm. (*Id.* at 58-59) He cannot open a jar, open a door, or button his buttons with his right hand. (*Id.* at 59)

Psonak requires help from his teenage daughter and seven-year-old son to cook and clean. (*Id.*) He cannot perform household chores due to his inability to reach or bend. (*Id.* at 60) He uses his left hand to maintain his personal hygiene. (*Id.*) He is able to reach with his right hand but he cannot grab anything with it, and it is painful for him to lift it. (*Id.* at 61) He can reach, lift, and carry a gallon of milk with his left hand. (*Id.*) He is able to cook prepackaged meals for his children. (*Id.*) Psonak is able to drive by using his left hand. (*Id.* at 63) He has not had alcohol since June of 2008. (*Id.* at 65)

Psonak's sister, Barbara Cornival, also testified. (*Id.* at 72)  She testified that Psonak has difficulty driving because he is unable to sit in one spot for long periods of time, and his reaction time has slowed significantly. (*Id.* at 73)  He also has difficulty climbing stairs, cutting his food, and writing. (*Id.*)  He cannot clean his apartment, pay his bills, or help his son with his schoolwork. (*Id.*)  Ms. Cornival talks to Psonak every day by telephone and visits with him in person once or twice a week. (*Id.* at 75)  She testified that her brother used to drink, but she had not seen him drink alcohol for six months prior to the hearing before the ALJ. (*Id.* at 75-76)

### b.    Vocational Expert's Testimony

The ALJ posed the following hypothetical to VE Tony Melanson:

Like for you to assume a person who is 44 years of age on his application date. Has a GED education. Right-handed by nature. Past relevant work as indicated. Suffering from various impairments including degenerative disc disease and/or fibromyalgia and/or arthritis. Status post effects of tumor in the neck operation. He also has neurofibromatosis in his body. He has some depression. He's been recently diagnosed as having diabetes, October of '08. These things do cause him to have moderate pain and discomfort, depression. In the lower leg, and shoulder, foot, and hip, not depression but pain, all of which are somewhat relieved by his medication without significant side effects. But he indicates he derives dry mouth or sleepiness from one or a combination. And if I find he needs to have simple, routine, unskilled job, Mr. Melanson. Low stress in nature, concentration and memory. Probably SVP 2 jobs. And at the appropriate time perhaps you can tell us exactly what that means. He's able to attend tasks and complete schedule. And if I find that he's mildly limited in his ability to perform his ADL's, interact socially, and to maintain concentration, persistence, and pace. And would be limited as to 10 pounds frequently, 20 pounds on occasion as to his lifting ability. Stand for 30 minutes, sit for 30 minutes consistently on an alternate basis during an eight-hour day. Heights and hazardous machinery to avoid, due to his sleepiness. Temperature and humidity extremes, vibration. And would be mildly to moderately limited as to push and pull, grip in that right upper extremity, and no repetitive neck turning. Jobs that require little writing ability due to his educational background. And no overhead reaching. Generally what I'm looking for, Mr. Melanson, is jobs that can be performed with one arm and minimal assist with the other. Can you give me jobs that would exist out there in the national economy with those limitations, in your opinion as a vocational expert, in significant numbers?

(*Id.* at 77-78)

The VE testified that Psonak's previous work as a construction worker was heavy and semi-skilled, and as a result, Psonak would have no transferable skills. (*Id.* at 76-77) The VE indicated that available jobs at a light, unskilled level of exertion included a gate tender, which has a specific vocational preparation ("SVP") score of two, with 200 gate tender positions available locally and 60,000 nationally. (*Id.* at 78-79) The VE reduced the numbers of available positions by about 70 percent to accommodate the hypothetical individual's additional limitations. (*Id.* at 79) The VE testified that there would be no other work that could be performed in the light or sedentary categories. (*Id.*) The ALJ then asked the VE to address the position of surveillance monitor. (*Id.*) The VE responded that this position required some writing, and noted about 150 positions available locally and 60,000 nationally. (*Id.*)

Psonak's counsel questioned the VE regarding whether Psonak would be able to perform any work if the RFC assessments of Drs. Ford and Aranudo were credited. (*Id.* at 80-81) Specifically, counsel asked the VE to consider a hypothetical individual who can carry ten pounds occasionally, is limited in his upper extremities with severe pain in his right upper extremity from shoulder into shoulderblade, down the arm and into the fingers, with numbness, tingling, and weakness. (*Id.* at 82) The hypothetical individual would have extremely limited mobility and strength in the right shoulder, arm, elbow, and hand, and would experience left foot drop, left foot pain, stiffness, and weakness from a prior crush injury, pain in his back, pain in fibromas on both legs, and knee stiffness and crackling. (*Id.*) The hypothetical individual would also experience pain in bending, squatting, climbing, reaching, stooping, and kneeling, and cannot be exposed to unprotected heights, moving machinery, or marked changes in temperature. (*Id.*)

The VE responded that, in view of these limitations, there would be no substantial gainful

11

activity that could be performed by the hypothetical individual.  (*Id.*)

### 3.  The ALJ's Findings

Based on the factual evidence and the testimony of Psonak, Ms. Cornival, and the VE,

the ALJ determined that Psonak had not been under any type of disability within the meaning of

the Act from September 15, 2006 through the date of his decision.  The ALJ's findings are

summarized as follows:

> 1.  The claimant has not engaged in substantial gainful activity since February 23,
> 2007, the application date (20 C.F.R. 416.971 *et seq.*).
>
> 2.  The claimant has the following severe impairments: Neurofibromatosis,
> Cervical and Thoracic Degenerative Disc Disease with neuropathy and
> radiculopathy, and Mood Disorder (20 C.F.R. 416.920(c)).
>
> 3.  The claimant does not have an impairment or combination of impairments that
> meets or medically equals one of the listed impairments in 20 C.F.R. Part 404,
> Subpart P, Appendix 1 (20 C.F.R. 416.925 and 416.926).
>
> 4.  After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform a range of light work as
> that term is defined in 20 C.F.R. 416.967(b).  The claimant can lift up to 10
> pounds frequently and up to 20 pounds on occasion, and the claimant can sit,
> stand, and walk for the duration of an 8-hour workday, but he must be permitted
> to alternate between positions at will or about every 30 minutes.  The claimant is
> limited in his right upper extremity use for all activities, and he cannot perform
> any tasks requiring overhead reaching, but he can otherwise perform all postural
> activities except crawling and climbing frequently.  Due to the combination of his
> physical impairments, the claimant must also avoid working at heights or with
> hazardous and/or vibrating machinery, and he must avoid working in extreme
> temperatures and/or humidity.  Finally, due to the combination of his pain, the
> side effects of his medications, and the symptoms of his mental impairment, the
> claimant is limited to simple, routine, non production pace unskilled work.
>
> 5.  The claimant is unable to perform any past relevant work (20 C.F.R. 416.965).
>
> 6.  The claimant was born on November 20, 1962 and was 44 years old, which is
> defined as a younger individual age 18-49, on the date the application was filed.
> (20 C.F.R. 416.963).
>
> 7.  The claimant has at least a high school education and is able to communicate
> in English (20 C.F.R. 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since February 23, 2007, the date the application was filed (20 C.F.R. 416.920(g)).

(D.I. 9, Tr. at 18-33)

## III.   STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment

13

pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Id.* at 250-51 (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A

district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g)

affirm, modify, or reverse the [Commissioner]'s decision with or without remand to the

[Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV.   DISCUSSION

### A.   Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. §423(a)(1)(D), "provides for the payment of

insurance benefits to persons who have contributed to the program and who suffer from a

physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  Title XVI of the

Social Security Act provides for the payment of disability benefits to indigent persons under the

SSI program.  42 U.S.C. § 1382(a).  A "disability" is defined for purposes of both DIB and SSI

as the inability to do any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than twelve months.  *See* 42 U.S.C. §

423(d)(1)(A).  A claimant is disabled "only if his physical or mental impairment or impairments

are of such severity that he is not only unable to do his previous work but cannot, considering his

age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy."  42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20,

21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a

five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d

422, 427-28 (3d Cir. 1999).  If a finding of disability or non-disability can be made at any point

in the sequential process, the Commissioner will not review the claim further.  20 C.F.R. §§

404.1520(a)(4), 416.920(a)(4).  At step one, the Commissioner must determine whether the

claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i),

416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial

gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires

the Commissioner to determine whether the claimant is suffering from a severe impairment or a

combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii),

416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not

severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the

claimant's impairments to a list of impairments that are presumed severe enough to preclude any

gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at

428. When a claimant's impairment or its equivalent matches an impairment in the listing, the

claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a

claimant's impairment, either singly or in combination, fails to meet or medically equal any

listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the RFC to

perform his past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating

claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A

claimant's RFC is "that which an individual is still able to do despite the limitations caused by

his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant

bears the burden of demonstrating an inability to return to his past relevant work." *Plummer*,

186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the

Commissioner to determine whether the claimant's impairments preclude her from adjusting to

any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-

disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428.  At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits.  *See Plummer*, 186 F.3d at 428.  In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [her] medical impairments, age, education, past work experience, and [RFC]." *Id.*  In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.*  At this step, the ALJ often seeks the assistance of a vocational expert.  *See id.*

### B.    Plaintiff's Arguments on Appeal

#### 1.    Sufficiency of the VE's opinion at step 5

Psonak alleges that the VE erred in testifying that an individual with the functional limitations and vocational factors identified by the ALJ would be capable of performing the job of "gate tender" because the position is semi-skilled, not unskilled as the VE testified at the hearing. (D.I. 15 at 3-4)  Psonak also contends that the position of surveillance system monitor does not satisfy the Commissioner's burden at step five due to the writing requirement, and Psonak cannot perform a sedentary position in light of the fact that he lacks bimanual dexterity. (*Id.* at 4-5)

In response, the Commissioner alleges that Psonak erroneously substitutes the requirements of the semi-skilled "gate guard" for the proffered position of "gate tender," which is listed in the Dictionary of Occupational Titles ("DOT") 690.686-042, as an unskilled position. (D.I. 18 at 22)  However, the Commissioner acknowledges that the gate tender position proffered by the VE was insufficient to constitute substantial evidence of Psonak's ability to perform work due to the medium exertional requirement.  (*Id.*)  Therefore, the parties' dispute centers only on

the sufficiency of the surveillance monitor position.

Social Security Ruling 96-9p states that "[m]ost unskilled sedentary jobs require good use of both hands and the fingers, i.e., bilateral manual dexterity . . . . Any significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base." S.S.R. 96-9, 1996 WL 374185, at *8. However, the condition does not automatically dictate a finding of disability when a VE is consulted to determine the extent of the erosion of the occupational base. *See Fox v. Comm'r*, 2009 WL 367628, at *19 (N.D.N.Y. 2009) (citing 20 C.F.R. § 416.966(e)). The DOT description of the surveillance system monitor position notes that aptitudes for handling, fingering, and feeling are not present. *See* DOT § 379.367-010. Moreover, the DOT lists "maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings." *Fox*, 2009 WL 367628, at *19.

In the present case, the VE accounted for Psonak's writing limitations before offering numbers of positions available:

> Well, there is – the surveillance monitor is a position that would require some writing. There's not a lot of writing. That's one of the – there would be some numbers in the surveillance monitor that could be . . . There would be about 150 locally, and about 60,000 nationally. Those are similar numbers. The other positions do require more handling, so that would be about all.

(D.I. 9, Tr. at 79) This conclusion is consistent with the hypothetical posed by the ALJ, which requested "[j]obs that require little writing ability," and Psonak's own testimony, which reflected that his ability to write was "inconsistent." (*Id.* at 40, 51, 78) The record shows that the VE calculated the extent of the erosion of the position based on Psonak's limited ability to write, and the ALJ did not err in relying on the VE's testimony. *See Fox v. Comm'r of Soc. Sec.*, 2009 WL

367628, at *19 (N.D.N.Y. 2009). The ALJ did not find Psonak incapable of writing,[3] and there is record evidence that he was able to write, albeit with difficulty. *See Welch v. Astrue*, 2012 WL 3113148, at *8 (D. Me. 2012) (finding any error by ALJ harmless where ALJ never clarified whether plaintiff retained ability to write with her non-dominant hand, but ALJ did not find plaintiff incapable of writing, and record evidence showed that plaintiff was able to write with difficulty). Therefore, substantial evidence supports the ALJ's conclusion that Psonak retained the RFC to perform the job of surveillance monitor.

### 2. Treating physicians' opinions

A treating source's medical opinion will be given "controlling weight" if an ALJ finds: (1) the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) the opinion is not inconsistent with the other substantial evidence in the record. *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001); 20 C.F.R. § 404.1527(d)(2); Social Security Regulation ("SSR") 96-2p. In many cases, even if a treating source's medical opinion does not meet the test for controlling weight, it will nevertheless be entitled to great weight and should be adopted by an ALJ. *Id.* In order to determine what weight to accord a non-controlling treating physician opinion, an ALJ is required to weigh the evidence in light of several factors. *Id.* These factors include: (1) the examining relationship – more weight is given to the opinion of a source that has examined a plaintiff as compared to a source that has not; (2) the length, nature and extent of the treatment relationship – more weight is given to the opinion of treating sources since these professionals are most able to provide a detailed and longitudinal picture of a plaintiff's medical history; (3) the supportability of the opinion – more weight is

---

[3] Although the ALJ placed a limitation on Psonak's ability to write due to his educational background, and not because of the nerve damage in his right hand, this error is harmless because the ALJ accounted for the fact that Psonak's ability to write was limited.

given the opinions that are well explained and supported with clinical or diagnostic findings; (4) the consistency of the opinion – more weight is given to opinions that are more consistent with the record as a whole; (5) specialization – opinions of specialists are given more weight; and (6) other factors which tend to support or contradict an opinion. 20 C.F.R. § 404.1527(d). Regardless of the weight accorded, an ALJ's determination must always provide "good reasons" for the weight given to a treating source's opinion, *id.*, and an ALJ can only "reject a treating physician's opinion if it is based on 'contradictory medical evidence.'" *Dougherty v. Astrue*, 715 F. Supp. 2d 572, 581 (D. Del. 2010) (citing *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)).

Psonak alleges that the ALJ erred in relying upon the opinion of a non-examining state agency physician who saw only a partial medical record before all the evidence was submitted. (D.I. 15 at 6)  According to Psonak, the ALJ's reliance was particularly misplaced because Psonak's two long-time treating specialists, Dr. Arnaudo and Dr. Ford, both offered detailed functional assessments consistent with disability that were not credited by the ALJ. (*Id.* at 7) Moreover, Psonak alleges that Dr. Arnaudo's opinion was not inconsistent with her own prior statements because she had said as early as May 14, 2007 that Psonak was unable to perform full-time work. (*Id.*)  Psonak contends that the same was true of Dr. Ford's opinion. (*Id.*)

In response, the Commissioner alleges that the ALJ appropriately discredited the opinions of Drs. Arnaudo and Ford after noting that the opinions were identical in both form and content and surmising that the opinions were not written by the treating physicians themselves. (D.I. 18 at 16-17)  Moreover, the Commissioner contends that the ALJ properly concluded that the treating physicians' opinions were inconsistent with their treatment notes, which indicated that Psonak responded well to treatment. (*Id.* at 17)

The court concludes that substantial evidence supports the ALJ's decision to reject the

findings of Dr. Ford and Dr. Arnaudo, which were inconsistent with the totality of the medical evidence. Psonak's course of treatment was generally conservative, consisting of physical therapy and pain medication or muscle relaxants. Moreover, Psonak's clinical findings were largely unremarkable. The ALJ noted that Dr. Yalamanchili instructed Psonak to increase his activity level and released him to work in a light duty supervisory capacity in May 2007, and found that he had full ranges of motion in his bilateral upper extremities. (*Id.* at 22) The ALJ also observed that Psonak's physical therapist recommended discharge from therapy and planned to have him return to work in a light-medium duty position. (*Id.*) In March 2008, Dr. Crain found full and painless ranges of motion in Psonak's neck and shoulders, and Psonak indicated that his left shoulder symptoms improved with his home exercises. (*Id.* at 24) Dr. Crain observed that X-rays of Psonak's shoulders were normal, without spur formation, joint space narrowing, or evidence of degenerative joint disease. (*Id.*) Cervical and thoracic X-ray and MRI studies taken in June 2008 revealed "no role for additional surgery." (*Id.*) For these reasons, substantial evidence supports the ALJ's conclusion that the opinions of Drs. Ford and Arnaudo should not be accorded controlling weight.

Psonak's allegations that the ALJ improperly relied on Dr. Borek's RFC assessment due to the passage of time following Dr. Borek's assessment are not supported by the case law. The Third Circuit has specifically noted that, "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2012).

### 3.    Failure to account for severe impairments

21

Lastly, Psonak alleges that the ALJ erroneously failed to find that his carpal tunnel syndrome[4] was a severe impairment under the second step of the analysis, and the ALJ's failure to include further limitations stemming from this condition was outcome determinative. (D.I. 15 at 8) According to Psonak, surgery in his left upper extremity to remove tumors did not relieve his symptoms, and the ALJ erred in not imposing any functional restrictions on the left upper extremity. (*Id.*)

In response, the Commissioner alleges that the ALJ did not deny Psonak's claim at step two of the analysis, and it was not necessary for the ALJ to specifically find additional alleged impairments to be severe. (D.I. 18 at 13-14) Moreover, the Commissioner contends that Psonak points to no established functional limitations resulting from his carpal tunnel syndrome other than those included in the ALJ's RFC assessment. (*Id.* at 14)

A review of the ALJ's decision reveals that the ALJ considered Psonak's claims regarding his carpal tunnel syndrome but rejected those complaints in view of the medical evidence of record. The ALJ acknowledged that Psonak experienced "some symptoms of pain and weakness in his left arm and hand," but noted that "no particular treatment measures, such as splints, were recommended or used with regard to the claimant's left hand issues." (D.I. 9, Tr. at 30) The ALJ concluded that Psonak's "mild to moderate and generally untreated carpal tunnel syndrome [did] not cause any functional limitations in [Psonak's] work-related abilities." (*Id.* at 25) The medical record is consistent with the ALJ's findings; therefore, the ALJ's determination that Psonak's carpal tunnel syndrome is not a severe impairment is supported by substantial evidence. (*Id.* at 775)

---

[4] In his opening brief, Psonak identifies both carpal tunnel syndrome and lumbar spine problems as severe impairments ignored by the ALJ. (D.I. 15 at 8) However, Psonak subsequently limits his argument to his left carpal tunnel syndrome in his reply brief. (D.I. 21 at

## IV.   CONCLUSION

For the reasons stated above, I recommend that the court deny Psonak's motion for summary judgment (D.I. 14) and grant the Commissioner's cross-motion for summary judgment (D.I. 17).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).  The objections and responses to the objections are limited to ten (10) pages each.

The parties are directed to the court's Standing Order In Non-Pro Se Matters For Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available at http://www.ded.uscourts.gov.

Dated: August 30, 2013

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE

5)

23